UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT S. HATHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11CV1036 TCM |
| | ) | |
| MICHAEL J. ASTRUE | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

BRIEF IN SUPPORT OF THE ANSWER

Nature of Action and Prior Proceedings

This suit involves two applications for benefits under the Social Security Act (the Act). The first is an application for disability benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq. (Tr. 109-16). The second is an application for Supplemental Security Income under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. (Tr. 117-22). Plaintiff's applications were denied initially (Tr. 66-71).[1] Following a hearing, an administrative law judge (ALJ) found that Plaintiff was "not disabled" and issued a decision dated March 26, 2009 (Tr. 14-21). On April 1, 2011, the Appeals Council denied Plaintiff's request for review, so the ALJ's decision stands as the final decision of the Commissioner, subject to judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3) (Tr. 1-5).

Statement of Facts

Plaintiff alleged that he became disabled on August 8, 2006, following a heart attack (Tr.

---

[1] Missouri is one of several test states participating in modifications to the disability determination procedures that apply in this case. See 20 C.F.R. §§ 404.906, 404.966, 416.1406, 416.1466. These modifications include, among other things, the elimination of the reconsideration step in the administrative appeals process. See id. Therefore, Plaintiff's appeal in this case proceeded directly from initial denial to the administrative law judge level.

151). In his disability report, Plaintiff stated that his chest hurts, he becomes winded when he walks more than 100 feet, and his legs get a "tight burning feeling" (Tr. 151).

Plaintiff went to the emergency room on August 8, 2006, complaining of radiating chest pain (Tr. 231). Otha Rains, M.D., and Sheila Lemley, M.D., diagnosed acute myocardial infarction (Tr. 184, 232, 262-64). After cardiac catheterization revealed total occlusion, cardiologist Robert Lehman, M.D., inserted two intracoronary stents, which provided "significant relief" (Tr. 272). The doctor emphasized that Plaintiff "must stop smoking" (Tr. 272). In a discharge report dated August 11, 2006, Dr. Lehman noted that Plaintiff had "done very well post infarction," showing "continued improvement" (Tr. 184, 260). He added that Plaintiff was "resigned to that fact that he must never smoke again" (Tr. 184, 260). When Plaintiff saw Dr. Lehman again on August 30, 2006, the doctor observed that Plaintiff had made satisfactory progress following his heart attack and stent placement, but still smoked (Tr. 252).

During a cardiac stress test on September 19, 2006, Plaintiff was able to exercise for nearly 7 minutes, achieving 70 percent of predicted heart rate and 8 metabolic equivalents (METS) (Tr. 205, 346). Plaintiff had no chest pain or arrhythmia, his blood pressure response was normal, and his recovery time was unremarkable (Tr. 205, 208, 230, 346). Musa Modad, M.D., indicated that the stress test was "suboptimal" because Plaintiff was unable to achieve 85 percent of predicted heart rate for his age (Tr. 206, 208, 230). Myocardial imaging on September 20, 2006, showed no evidence of reperfusible ischemia and a questionable ejection fraction[2] of 16 percent (Tr. 207).

---

[2] "Ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. See Grogan, Martha, M.D., Ejection fraction: What does it measure? (Sept. 17, 2010), available at www.mayoclinic.com/health/ejection-fraction/AN00360.

On September 27, 2006, Dr. Lehman expressed doubt about the 16 percent ejection fraction rating and ordered additional testing (Tr. 229). Twenty-four hour Holter monitoring neither supported nor explained Plaintiff's complaints of lightheadedness, chest pain, and arm numbness, and an echocardiogram on October 4, 2006, showed just mild left atrial enlargement and mild insufficiency, and and an ejection fraction of 43 percent (Tr. 195, 197-202).

On October 25, 2006, Plaintiff met with Dr. Lehman for a follow-up visit (Tr. 180, 340). Dr. Lehman concluded that Plaintiff's condition was stable and he was capable of performing "light duty," though he should continue follow up with rehabilitation and avoid tobacco (Tr. 180, 340). He noted that Plaintiff's ejection fraction was up to 43 percent (Tr. 180, 340).

Plaintiff saw Dr. Lehman two months later, on December 20, 2006, reporting that he ran out of breath easily, could not work much, and wanted to "see about disability" (Tr. 179). Dr. Lehman noted no angina and an ejection fraction of 33 percent (Tr. 179, 185). On February 28, 2007, Dr. Lehman noted that Plaintiff was smoking again and instructed him to quit smoking (Tr. 338, 372). He also referred Plaintiff for possible placement of a pacemaker (Tr. 372).

Plaintiff met with Carey Fredman, M.D., on March 8, 2007, to discuss the possibility of a prophylactic pacemaker (Tr. 317-18). Plaintiff complained that he tired easily and was out of breath with exertion but was otherwise "doing reasonably well" (Tr. 281, 324). A review of systems was unremarkable (Tr. 281). Dr. Fredman observed that Plaintiff continued to smoke heavily but had no other medical problems (Tr. 281, 317-18, 324). He explained that Plaintiff had a 20 percent 2-year risk of a life-threatening ventricular arrhythmia and a pacemaker would protect him from sudden cardiac death (Tr. 318). Dr. Fredman recommended further testing and consideration of a defibrillator (Tr. 282, 324-25).

On April 17, 2007, an electrophysiologic study showed normal atrioventricular conduction and an inducible ventricular flutter (Tr. 280, 295, 300-02, 319, 326-27). Dr. Fredman implanted a pacemaker defibrillator that day (Tr. 303-04, 319-21). He noted that Plaintiff did "quite well" with the procedure, and testing the following day confirmed that the device was functioning normally (Tr. 311, 316). Plaintiff saw Dr. Fredman a month later, on May 14, 2007, for a pacemaker check (Tr. 354). Dr. Fredman observed that the implant site was well-healed and the device was functioning normally, and told Plaintiff to return in four months (Tr. 354).

Plaintiff saw Dr. Lehman on June 27, 2007, reporting chronic fatigue and lightheadedness (Tr. 371). Dr. Lehman reviewed Plaintiff's medications (Tr. 371).

On September 13, 2007, and December 7, 2007, Plaintiff saw Lynelle Jolliff, R.N., a advanced practice cardiac nurse in Dr. Fredman's office, for routine pacemaker checks (Tr. 352-53). Plaintiff reported that he was doing well, other than occasional dizziness (Tr. 352-53). During both visits, Ms. Jolliff noted that the device was functioning normally (Tr. 352-53).

On December 12, 2007, Plaintiff saw Dr. Lehman for a follow-up visit, complaining of financial stress and a "butterfly feeling" in his chest (Tr. 370). Dr. Lehman reviewed Plaintiff's medications and noted his continued smoking abuse (Tr. 370). That same day, Dr. Lehman completed a one-page "Physician's Assessment for Social Security Disability Claim" form (Tr. 336, 365). He stated that Plaintiff's diagnosis was ischemic cardiomyopathy, with a history of myocardial infarction (Tr. 336, 365). In response to the question "Is the patient's endurance affected by the impairment(s)? If so, how many hours in an eight hour work day would the patient need to rest?," Dr. Lehman wrote, "Yes. 4hr." In response to a question of whether Plaintiff could perform sedentary work at the present time, Dr. Lehman wrote, "No. Not full

4

time." (Tr. 336, 365). Even though the form asked the physician to state the reason for the answer, Dr. Lehman did not do so (Tr. 336, 365).

On April 1, 2008, Plaintiff saw Ms. Jolliff for a pacemaker check (Tr. 351). Plaintiff reported he was doing well and had no complaints (Tr. 351). The pacemaker was functioning normally and had detected no ventricular flutter since the time of the implant (Tr. 351).

Plaintiff saw Dr. Lehman on July 2, 2008, for a three month follow-up, reporting that he was very fatigued following an intense dream (Tr. 369). Dr. Lehman reviewed Plaintiff's medications, noting that Plaintiff still smoked (Tr. 369).

The following week, Dr. Fredman checked Plaintiff's pacemaker, which had not detected any ventricular flutter since the implant (Tr. 350). The device was functioning normally, and Dr. Fredman said he would check it again in three months (Tr. 350). That same day, Plaintiff underwent a pharmacologic stress test and myocardial imaging (Tr. 360, 373). Testing was negative, with no electrocardiographic evidence of ischemia (Tr. 360, 373). Myocardial imaging, however, showed evidence of a large anterior infarct (Tr. 360, 373).

On July 16, 2008, Plaintiff saw Dr. Lehman for a follow-up (Tr. 368). Dr. Lehman noted Plaintiff's test results and observed that Plaintiff's ejection fraction was 46 percent (Tr. 368).

Plaintiff saw his primary care physician, Deborah Depew, D.O., on August 6, 2008, complaining of eczema on his foot, but specifically denying chest pain, palpitations, or any other problems (Tr. 358). Plaintiff saw Dr. Depew again on August 21, 2008, complaining of a one-year history of intermittent coccyx pain, relieved by standing (Tr. 356-57). X-rays showed posterior displacement of the distal segment of the coccyx, which suggested a remote fracture (Tr. 356). Plaintiff told Dr. Depew that he recalled an incident a year earlier when "he had been

trying to load a cow onto a trailer when the cow spooked and butted him back into a metal gate" (Tr. 356). Dr. Depew recommended physical therapy (Tr. 356).

Plaintiff saw Dr. Lehman later that month, on August 27, 2008, reporting that he was "doing well" (Tr. 367). Likewise, during a pacemaker check on October 16, 2008, Plaintiff told Ms. Jolliff that he was "doing well" other than some "some lower back discomfort" (Tr. 349). Ms. Jolliff observed that Plaintiff's pacemaker was functioning normally (Tr. 349).

Plaintiff saw Dr. Lehman for a follow-up appointment on January 14, 2009, claiming that he "can't do much" because of fatigue, but he had no chest pain (Tr. 366). Dr. Lehman observed that Plaintiff continued to smoke (Tr. 366). That same day, Dr. Lehman noted on a one-page form that his opinion of December 12, 2007, which indicated that Plaintiff would be unable to sustain full-time sedentary work, was unchanged (Tr. 364). As explanation of his opinion, Dr. Lehman wrote only, "He has cardiomyopathy (weakened heart muscle)" (Tr. 364).

At an administrative hearing on February 18, 2009, Plaintiff testified that he was 45 years old and lived in a trailer with his girlfriend (Tr. 27). He had completed high school and some additional computer training (Tr. 27). Plaintiff worked as a truck driver for six or seven years until August 2006, when he suffered a heart attack (Tr. 30-31). Prior to that, he held jobs delivering furniture and setting up offices, performing building maintenance, driving boom trucks and forklifts, and serving as a dispatcher (Tr. 31-34). Plaintiff said he had no physical energy or ability to concentrate since his heart attack (Tr. 35). He "can't breath" and his "legs are dead" (Tr. 35). Plaintiff also injured his tail bone while hauling cattle in 2007 or early 2008 (Tr. 35-38). Plaintiff took a number of medications, including Tylenol as needed, but no prescription pain medication (Tr. 38-39). During a normal eight-hour day, Plaintiff walked about 30 minutes,

6

sat for 4 or 5 hours, and stood for 50 to 60 minutes, although he could stand for only 10 minutes at a time without support (Tr. 39-40). He could walk 7 or 8 minutes, maybe 20 if he pushed it (Tr. 41). If he tried to walk far or stand for long, his "legs go dead," "like somebody's jabbing a bunch of needles" in them (Tr. 52). When he sits, he has pain in his tail bone and leg numbness (Tr. 52). Plaintiff reported chest pain, difficulty bending over to tie his shoes, and sensitivity to heat and cold (Tr. 41, 54).

On a typical day, Plaintiff watched television, visited his girlfriend's dad at his shop, and helped open gates "if he's got to feed cows" (Tr. 48). He cooked and did dishes every once in a while, but no laundry or yard work (Tr. 42, 47-48). Plaintiff used to weld, ride horses, and keep a garden, but could no longer do these things; he said that his physician told him not to ride horses, weld, or work on cars when they're running, and to stay away from electrical fields (Tr. 43-45, 50). He drove once or twice a week and smoked one-half to three-quarters of a package of cigarettes a day (Tr. 46). The ALJ noticed that Plaintiff had a tan and asked if he spent time outdoors (Tr. 56). Plaintiff responded that he sat outside on a chair and at a picnic table (Tr. 56).

A vocational expert described Plaintiff's past work as a truck driver and delivery driver as medium and semi-skilled (Tr. 58). Other prior jobs were skilled, semi-skilled, and unskilled, all performed at the medium level (Tr. 59). The ALJ asked the vocational expert about a hypothetical individual with Plaintiff's vocational profile and residual functional capacity (RFC) (Tr. 60). The vocational expert testified that such an individual could perform sedentary, unskilled jobs as an order clerk, with 264,520 positions nationally; addresser, with 153,530 positions nationally; and call-out operator, with 67,400 positions nationally (Tr. 60-61).

7

Statement of the Issue

The general issue in a Social Security case is whether the Commissioner's final decision is supported by substantial evidence on the record as a whole. The specific issues posed here are:

I. Whether the ALJ's assessment of Plaintiff's credibility is supported by substantial evidence;

II. Whether the ALJ's assessment of the opinion of Plaintiff's treating physician is supported by substantial evidence;

III. Whether the ALJ's's assessment of Plaintiff's RFC is supported by substantial evidence; and

IV. Whether the ALJ properly relied on testimony of the vocational expert in determining that Plaintiff was not disabled.

Standard of Review

The standard of appellate review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. See Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008). Evidence that both supports and detracts from the Commissioner's decision should be considered, and an administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. See Finch, 547 F.3d at 935 (citing Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). A court should disturb the ALJ's decision only if it falls outside the available "zone of choice" and a decision is not outside that zone of choice simply because the court may have reached a different conclusion had the court been the fact finder in the first instance. See Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) (citations

omitted). The Eighth Circuit has further noted that a court should "defer heavily to the findings and conclusions of the SSA." Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

Argument

To establish disability, a claimant must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. See 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Supreme Court in Barnhart v. Walton, 122 S. Ct. 1265 (2002), upheld the Commissioner's interpretation of this statutory definition which requires that the disability, and not only the impairment, must have lasted or be expected to last for 12 months.

After carefully considering the entire record, the ALJ found that Plaintiff had the severe impairments of chronic ischemic heart disease and cardiac dysrythmia (Tr. 16). But he retained the RFC to perform sedentary work, with the ability to change positions frequently; occasionally climb stairs and ramps; never climb ropes, ladders, or scaffolds, stoop, or kneel; and avoid concentrated exposure to cold, heat vibration, hazards of heights, and machinery (Tr. 17). See 20 C.F.R. §§ 404.1567 and 416.967. Based on this RFC and vocational expert testimony, the ALJ determined that Plaintiff could perform work that exists in significant numbers in the national economy (Tr. 20-21). An individual who can perform work is not disabled. See 20 C.F.R. §§ 404.1520(g) and 416.920(g).

I.  The ALJ Properly Evaluated the Credibility of Plaintiff's Subjective Complaints.

Plaintiff asserts that the ALJ's credibility assessment was unfair and unreasonable. See Pl.'s Br. at 9-11. But the ALJ's assessment of Plaintiff's credibility comported with SSA regulations and case law and was supported by substantial evidence of record (Tr. 17-20).

Credibility questions concerning a claimant's subjective testimony are "primarily for the ALJ to decide, not the courts." See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). When the ALJ articulates inconsistencies that undermine a claimant's subjective complaints and those inconsistencies are supported by the record, the ALJ's credibility determination should not be disturbed. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) ("We will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility.").

Plaintiff asserts that the ALJ "unreasonably evaluates the Plaintiff's daily activities as being inconsistent with disability." See Pl.'s Br. at 9-11. But daily activities are a proper factor for the ALJ to consider in assessing credibility. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). Though Plaintiff was no longer able to ride horses and load 500 pounds of feed on a dolly like he could before his heart attack, he was nonetheless able to carry on a normal life, which supports the ALJ's finding that his impairments were not disabling (Tr. 30, 35). See id. Plaintiff remained able to walk short distances to and from his girlfriend's father's shop, head home at noon for a sandwich, watch television, drive, care for dogs, take out the trash, and shop twice a week (Tr. 18, 142-45). He walked on a treadmill three times a week for 20 minutes (Tr. 159). He could occasionally hunt and fish when the weather permitted (Tr. 18-19, 146). And he was able to help open gates and load cattle (Tr. 19, 36-37, 356). He chatted with family members and friends on the phone and in stores, and attended children's school programs (Tr. 146). He had no problems with personal care (Tr. 143).

Although the record shows that Plaintiff had some physical limitations, it does not establish an inability to perform sedentary work activity (Tr. 19). In fact, Plaintiff represented that he spent much of his day performing relatively sedentary activities without needing to rest

10

(Tr. 17-18, 142). Plaintiff asserts, correctly, that a claimant need not be completely bedridden to be disabled. See Pl.'s Br. at 11. On the other hand, Plaintiff is not precluded from *all* work simply because he tires more easily than he once did and he can no longer ride horses or lift heavy weights (Tr. 18-19). As the ALJ noted, Plaintiff's daily activities are consistent with a finding that Plaintiff can perform sedentary work (Tr. 17-20, 142-46).

Further, as the ALJ noted, the objective medical evidence did not support Plaintiff's claimed inability to work in any capacity (Tr. 18-19). A stress test in September 2006 showed that Plaintiff exercised for 6 minutes and 49 seconds and achieved 8 METS (metabolic equivalent of tasks), which, Ruth Stoecker, M.D., stated is consistent with the ability to perform at least sedentary work (Tr. 17-18, 205, 330-31, 346). Moreover, before installation of a pacemaker, Plaintiff was described as class II congestive heart failure, which is consistent with a *slight* limitation in physical activity (Tr. 17, 280, 294, 330-31, 317, 319). Although Plaintiff complained of fatigue, as the ALJ noted, there was no medical indication that Plaintiff experienced other exertional symptoms, such as angina (Tr 18, 179, 185). Nor is there credible evidence to show that he had to nap or rest for long periods during the work day. (Tr. 18). Despite his claimed inability to work, he generally reported to treating physicians that he was doing well, with no major complaints other than occasional financial stress, fatigue, and dizziness (Tr. 281, 324, 349, 351-53, 358, 370).

In assessing Plaintiff's credibility, the ALJ also noted that Plaintiff continued to smoke, despite repeated instruction from his doctors to stop (Tr. 18-19, 46, 180, 184, 252, 260, 272, 281, 317-18, 324, 338, 346, 359, 366, 369-70, 372). This suggests that Plaintiff did not consider his impairments to be so severe and disabling as to require him to stop smoking (Tr. 19). "A failure

11

to follow a recommended course of treatment also weighs against a claimant's credibility." Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005). See also Meeks v. Apfel, 993 F.Supp 1265, 1276 (W.D.Mo. 1997) (the ALJ was justified in finding Plaintiff was not credible where he repeatedly ignored directions to lose weight, stop smoking, and begin an exercise program).

The ALJ's consideration of the subjective aspects of Plaintiff's complaints comported with the Commissioner's regulations at 20 C.F.R. §§ 404.1529 and 416.929 and the framework set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which includes consideration of a claimant's daily activities and functional restrictions (Tr. 17-19). Because the ALJ identified inconsistencies in the record as a whole which provided a sufficient basis upon which to discount Plaintiff's subjective complaints, the ALJ's credibility assessment should be upheld. See Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

II.     The ALJ Properly Assessed Medical Opinion Evidence.

Plaintiff asserts that the ALJ erred in declining to give controlling weight to the opinion of Dr. Lehman, Plaintiff's treating cardiologist. See Pl.'s Br. at 6-8. Plaintiff also suggests that the ALJ improperly gave weight to the opinion of a State agency examiner with unspecified credentials. See Pl.'s Br. at 7. Contrary to Plaintiff's assertion, the ALJ's consideration of medical opinion evidence was proper (Tr. 18).

Social Security regulations and rulings address the manner in which medical opinions are considered in assessing a claimant's RFC. See 20 C.F.R. §§ 404.1627 and 416.927; SSR 96-2p. Although a treating physician's opinion is generally entitled to controlling weight, such is only the case where "'it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" Medhaug v. Astrue, 578

F.3d 805, 815 (8th Cir. 2009) (quoting Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005)). A treating physician's opinion may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory. See 20 C.F.R. §§404.1527(d), 416.927(d).

The ALJ properly discounted Dr. Lehman's opinion because it was not supported by medically acceptable clinical techniques and was inconsistent with other evidence of record (Tr. 18, 336, 364-65). Shortly after Plaintiff's heart attack, Dr. Lehman opined that Plaintiff was doing "very well" and released Plaintiff to "light duty" (Tr. 180, 184, 260, 340). Only after Plaintiff made subjective complaints of fatigue and specifically asked about disability did Dr. Lehman indicate that Plaintiff would be unable to work (Tr. 179, 336, 365-66). Dr. Lehman offered his terse 2009 opinion the same day Plaintiff reported that he couldn't "do much" because of fatigue (Tr. 366). It appears that Dr. Lehman's findings were informed by Plaintiff's subjective complaints, not objective medical evidence. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (ALJ may discredit physician's opinion that is based on Plaintiff's subjective statements). In fact, Dr. Lehman provided no explanation for his conclusion, other than to state that Plaintiff "has a cardiomyopathy" (Tr. 336, 364). In contrast to the opinion, treatment notes from Dr. Lehman and Dr. Fredman generally indicated that Plaintiff was doing "reasonably well," which is inconsistent with a finding of complete disability (Tr. 281, 324, 352-53).

The ALJ properly considered a report from Dr. Stoecker, a state agency physician, who reviewed the evidence of record and opined that Plaintiff's activities and the objective medical findings were consistent with an RFC of light work (Tr. 18, 329-34). Plaintiff states that the ALJ erroneously refers to Dr. Stoecker as a physician, even though the RFC form does not include any medical credentials (Tr. 18, 334). See Pl.'s Br. at 7. But the "code 19" on the RFC form

13

indicates that Dr. Stoecker is a specialist in internal medicine (Tr. 334).[3] SSA policy expressed in the Program Law Operations Manual System (POMS) explains that forms completed by doctors contain a code in the medical specialty code section, while forms completed by non-physicians do not. See POMS DI 24510.050.[4] Dr. Stoecker's credentials are also evident on the disability transmittal forms, reviewed by "Ruth Stoecker, MD" (Tr. 66-67). State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. See 20 C.F.R. § 404.1527(f)(2)(i), 416.927(f)(2)(i); SSR 96-6p. The ALJ's consideration of Dr. Stoecker's medical opinion was proper.

III.   The ALJ's Assessment of Plaintiff's RFC is Supported by Substantial Evidence.

Plaintiff asserts that the RFC is deficient because it is based on the ALJ's opinion of the evidence rather than a medical opinion from a treating source. See Pl.'s Br. at 8-9. Contrary to Plaintiff's assertion, the RFC is a determination based on *all* of the evidence of record, not just medical evidence. See Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). The RFC formulation is a part of the medical portion of a disability adjudication as opposed to the vocational portion, which involves consideration of age, education, and work experience. Although it is a medical question, it is not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather an ALJ has the duty to formulate RFC based on all the relevant, credible evidence of records. See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.

---

[3]  A description of SSA medical speciality codes is available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510090.

[4]  The POMS is available at http://policynet.ba.ssa.gov/poms.nsf/lnx/0424510050. It explains that "MCs [medical consultants, i.e. doctors] should input the appropriate code in the MEDICAL CONSULTANT'S CODE block. [Non-physicians] should not make any entry in this block." See POMS DI 24510.050.

14

2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); see also 20 C.F.R. §§ 404.1545 and 416.945; SSR 96-8p.

The ALJ found that Plaintiff could perform sedentary work with a sit/stand option and the ability to change position frequently; occasionally climb stairs and ramps; never climb ropes, ladders, or scaffolds, stoop, or kneel; and avoid concentrated exposure to cold, heat, vibration, and hazards of heights and machinery (Tr. 17). The ALJ carefully considered the entire record before making a determination about Plaintiff's RFC and the extent to which it was consistent with Plaintiff's representations and other evidence in the record (Tr. 16-20). The ALJ's RFC assessment should be upheld.

IV. The ALJ's Hypothetical Question and Reliance on Vocational Expert Testimony was Proper.

After posing a hypothetical question to the vocational expert about an individual of Plaintiff's age, education, work background, and RFC for sedentary work with additional limitations, including the inability to stoop, he ALJ found, based on the vocational expert testimony, that Plaintiff could perform work that existed in significant numbers in the national economy (Tr. 20-21, 59-50). See 20 C.F.R. §§ 404.1566(e), 416.966(e). The ALJ was justified in relying on the vocational expert's testimony to find Plaintiff not disabled. See Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991).

## Conclusion

Because the decision of the ALJ is supported by substantial evidence on the record as a whole, the decision should be affirmed.

Respectfully submitted,

RICHARD G. CALLAHAN
UNITED STATES ATTORNEY


  s/ Jane Rund
JANE RUND #47298MO
Assistant United States Attorney
111 South 10th Street, Suite 20.333
St. Louis, Missouri 63102
(314) 539-2200
(314) 539-2777 FAX

OF COUNSEL
Kristi A. Schmidt
Acting Chief Counsel, Region VII
Social Security Administration

By

Carol S. Clark, #42670
Assistant Regional Counsel, Region VII

CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2012, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: Robert A. Crowe, Attorney for Plaintiff, 720 Olive Street, Suite 2300, St. Louis, Missouri 63101.


s/ Jane Rund
JANE RUND #47298
Assistant United States Attorney