UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT S. HATHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:11cv1036 TCM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Robert S. Hathman (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned for a final disposition pursuant to the written consent of the parties.  See 28 U.S.C. § 636(c). Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB in February 2007 and SSI in March 2007, alleging he was disabled as of August 8, 2006, by acute myocardial infarction and placement of a defibrillator

pacemaker. (R.[1] at 109-22.)  His applications were denied initially and after a hearing held in February 2009 before Administrative Law Judge (ALJ) Victor L. Horton.  (Id. at 11-72.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

### **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Delores E. Gonzalez, M.Ed., a vocational expert, testified at the administrative hearing.

Plaintiff testified that, at the time of the hearing, he was 45 years old, was married, and was living in a trailer with a girlfriend.  (Id. at 26-27.)  He has a twelfth grade education and had completed a two-week computer training course when he worked with the Sullivan Police Department.  (Id. at 27-28.)  He is right-handed, 6 feet 3 inches tall, and weighs 265 pounds. (Id. at 28.)  He wears glasses when reading.  (Id. at 28-29.)  The only household income is what his girlfriend earns.  (Id. at 29-30.)  He last drew unemployment approximately ten years ago.  (Id. at 30.)

Plaintiff last worked in August 2006, driving a truck and loading and unloading feed for the Missouri Farmers' Association (MFA).  (Id.)  He had worked for the MFA for six to seven years before having a heart attack that August. (Id. at 31.)  Before that, he worked for an office supply company, assembling, delivering, and setting up furniture.  (Id. at 31-32.) He left that job after approximately one year to work for the MFA.  (Id. at 32.)  Before the

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

office supply job, he worked as a maintenance man for the "Flying J." (Id. at 32-33.) He left that job after less than a year for better job at the office supply company. (Id. at 33.) Before "Flying J," he drove trucks for a material supply company for six to seven years. (Id. at 33-34.)

Asked to describe why he can no longer work, Plaintiff explained that he has no energy or ability to concentrate since having his heart attack. (Id. at 35.) He cannot walk farther than 150 feet without having to stop and breathe. (Id.) Also, he broke his tailbone a year and a half ago when hauling cattle. (Id. at 36-37.) Asked if that was within his period of disability, Plaintiff clarified that he had just been riding along. (Id. at 37.)

Plaintiff takes four to five pills in the morning and one in the evening. (Id. at 38.) The only pain medication he is allowed to take is Tylenol. (Id.) He goes through a bottle of Tylenol a week.[2] (Id.) His other medications cause memory loss. (Id. at 39.)

During a normal eight-hour day, Plaintiff spends a total of, at most, thirty minutes walking and four to five hours sitting. (Id. at 39-40.) Tailbone pain prevents him from sitting for too long. (Id. at 52.) He cannot stand for longer than seven to eight minutes without having to lean on something. (Id. at 41.) Hot and cold weather bother him. (Id.) He cannot climb more than seven steps without having to stop. (Id. at 53.) Bending and stooping are painful, making it hard for him to tie his shoes. (Id. at 53, 54.) He used to be able to do some welding at his girlfriend's father's shop, but can no longer because of the "device" in his chest. (Id. at 43-44.) Because of the defibrillator, he can no longer ride horses. (Id. at

---

[2]He could not describe how big a bottle it was.

44.)  He had occasionally tried to after the heart attack, but tired quickly.  (Id.)  He had also tried tilling his garden, but found he could not hold on to the tiller.  (Id. at 44-45.)  Once or twice a week, he drives.  (Id. at 46.)  He does not do many chores around the trailer.  (Id. at 47.)  He sets the trash on the porch, then someone else picks it up and burns it.  (Id.)  He does not vacuum and, after ruining a load of clothes, does not do the laundry.  (Id.)  He occasionally does the dishes.  (Id.)  After the ALJ noted that Plaintiff had a tan that made it obvious he spent time outside, Plaintiff explained he went in and out of doors and sat outside on a chair at a picnic table.  (Id. at 56.)

After getting up in the morning, he watches television until about 9:00 a.m., visits his girlfriend's father – he lives 75 feet away – until noon, returns to the trailer with the father and has lunch, and then opens gates for the father if he is feeding cattle.  (Id. at 48.)

He smokes half to three-quarters of a pack of cigarettes a day.  (Id. at 46.)  His doctor has told him to quit.  (Id.)  Before the heart attack, he smoked two to three packs a day.  (Id. at 49.)

The last time he traveled farther than 100 miles from home was when he and his girlfriend went to Kentucky two years earlier.  (Id. at 46-47.)

As of January 31, 2009, he no longer has health insurance.  (Id. at 49.)

His doctor, Dr. Fredman, has prohibited him from horseback riding, welding, and working on cars when they are running.  (Id. at 50.)  He is to stay away from electrical fields and is to hold a cellular telephone on the opposite side from his heart.  (Id.)

Ms. Gonzalez, testifying without objection as a vocational expert (VE), described Plaintiff's past work in terms of its skill and exertional levels.  (Id. at 58-59.)

She was then asked to assume a hypothetical individual with Plaintiff's education, training, and work experience who could lift and carry twenty pounds occasionally, ten pounds frequently, stand and walk for two hours out of eight, and sit for six hours out of eight, but who could only occasionally climb stairs and ramps; never climb ropes, ladders, or scaffold; and had to avoid concentrated exposure to cold, heat, vibration, and hazardous heights and machinery.  (Id. at 60.)  This person could not perform Plaintiff's past relevant work.  (Id.)  He could, however, perform other jobs, including those of an order clerk, addresser, and call-out operator.  (Id.)  These jobs exist in significant numbers in the regional and national economies.  (Id.)

If this hypothetical person could lift and carry no more than ten pounds, needed a sit/stand option with the ability to frequently change positions, and could only occasionally stoop and kneel, this person would be able to perform those same three jobs.  (Id. at 60-61.)

If this hypothetical person needed an "at will" sit/stand option and more than three breaks during an eight-hour day, there were no jobs the person could perform.  (Id. at 61.)

If Plaintiff's descriptions about his functional limitations, particularly his need to rest and his problems with concentration and memory, were accepted, there were no jobs he could perform.  (Id. at 62.)

The VE stated that her testimony was consistent with the *Dictionary of Occupational Titles* (DOT).  (Id. at 63.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and two assessments of his functional limitations.

When applying for DIB and SSI, Plaintiff completed a Disability Report. (Id. at 150-58.)  He listed his height as 6 feet 3 inches tall and his weight as 258 pounds.  (Id. at 150.)  He is limited in his ability to work by a heart attack.  (Id. at 151.)  Now, his chest starts hurting as soon as he tries to do anything physical and he then has to sit down and wait.  (Id.)  He can walk no farther than 100 feet.  (Id.)  His heart attack occurred on August 8, 2006, and prevented him from working that same day.  (Id.)  His medications include Lipitor for high cholesterol; Lisinopril, Plavix, and Toprol for his heart; and Protonix for acid reflux.  (Id. at 156.)

Plaintiff also completed a Function Report.  (Id. at 142-49.)  Asked to describe what he did from when he awoke until he went to bed at night, he reported that he ate breakfast, watched television, walked "a little" outside, went to his girlfriend's father's shop, ate a sandwich at noon, returned to the shop, ate supper, watched television, and went to bed.  (Id. at 142.)  He does not take care of anyone else; he does feed two dogs.  (Id. at 143.)  He no longer sleeps through the night.  (Id.)  He has no problem with his personal grooming tasks.  (Id.)  His girlfriend reminds him to take his medication. (Id. at 144.)  He prepares sandwiches and microwaved frozen dinners on the weekends.  (Id.)  He takes the trash out every Saturday.  (Id.)  His girlfriend does the house and yard work.  (Id. at 145.)  He goes grocery

shopping with his girlfriend.  (Id.)  He can only hunt or fish when the temperature permits; he can no longer go horseback riding.  (Id. at 146.)  He speaks with his sister over the telephone, sees people at the store, and attends children's[3] programs at school.  (Id.)  He regularly goes to Wal-Mart, a grocery store, and the NAPA[4] store.  (Id.)  His impairments adversely affect his abilities to lift, squat, walk, climb stairs, remember, and complete tasks.  (Id. at 147.)  They do not affect his abilities to, among other things, concentrate, bend, understand, or follow instructions.  (Id.)  He cannot lift over 20 pounds or walk farther than 100 yards before having to rest for 20 to 30 minutes.  (Id.)  He finishes what he starts.  (Id.)  He gets along okay with authority figures.  (Id. at 148.)  He can handle changes in routine, but gets upset or angry when under stress.  (Id.)

Two months after this report was filed, an agency employee called Plaintiff about updating his activities of daily living form.  (Id. at 159.)  He reported that he constantly feels tired and cannot do anything for longer than ten to fifteen minutes..  (Id.)  He tries to walk three times a week, twenty minutes each time on his treadmill at 2.8 miles per hour.  (Id.)  By the end of the time, his legs are burning and he is out of breath.  (Id.)  He had tried to till his garden and plant cucumbers, but had to rest for twenty minutes after working for only ten.  (Id.)  He does not know what job he can do because he is "only capable of sitting and doesn't have the interest or skills for a sit down job."  (Id.)

---

[3]Plaintiff has five children; they do not live with him.

[4]National Automotive Parts Association.

Plaintiff's earnings record shows consistent earnings for the years from 1978 to 2006, inclusive. (Id. at 126.) In 2005, his annual reported earnings were $24,549[5]; in 2006, they were $17,261. (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications. (Id. at 163-69.) Since he had completed the initial report, there had been no changes in his impairments and no new impairments. (Id. at 164.)

The medical record before the ALJ primarily are of Plaintiff's heart condition and are summarized below in chronological order.

On August 8, 2006, Plaintiff went to the Missouri Baptist Hospital at Sullivan (MBH-S) emergency room at 4 o'clock in the morning with complaints of sporadic chest pain that had started the day before and had woken him up that night. (Id. at 231-51.) He had an abnormal electrocardiogram (EKG), and was transferred by air to Missouri Baptist Medical Center (MBMC). (Id. at 239.) Plaintiff was admitted to MBMC and diagnosed with severe single vessel coronary artery disease with total occlusion of the left anterior descending (LAD) artery and moderate left ventricular dysfunction. (Id. at 274.) He underwent a left heart catheterization, bilateral coronary angiograms, a complex percutaneous transluminal coronary angioplasty (PTCA), and intracoronary stenting of the LAD. (Id. at 272.) He was discharged on August 11 with diagnoses of (1) acute anterior wall myocardial infarction; (2) status post PTCA and stenting; (3) hypercholesterolemia; (4) smoking abuse; and (5) mild mitral insufficiency. (Id. at 260.) It was noted on the discharge summary that Plaintiff had

---

[5]The amounts have been rounded to the nearest dollar.

"done very well post infarction," was "very motivated," and was "resigned to the fact he must never smoke again."  (Id.)  Aggressive antiplatelet therapy and post myocardial infarction care were recommended, as was the necessity for Plaintiff to stop smoking.  (Id. at 272, 266.)

Plaintiff returned to MBH-S to see Robert B. Lehman, M.D., for a follow-up visit on August 30.  (Id. at 252.)  It was noted that he still smoked.  (Id.)  He was continued on his medications.  (Id.)

Plaintiff underwent various tests on September 19 and 20.  He had suboptimal results on the stress test, having been able to achieve only 85% of the predicted heart rate for his age and 8 METS (metabolicequivalents).  (Id. at 205-06, 208, 212-28, 230, 346.)  Myocardial radionuclide imaging revealed "a large area of fixed perfusion defect in the anterior and apical wall as well as in the inferior wall consistent with significant infarction.  There [was] no evidence of reperfusible ischemia."  (Id. at 207.)  It also revealed "marked diffuse wall abnormalities" and "global hypokinesis[6] with most severe akinesis[7] noted in the distal aspect of the spetum and base of the heart."  (Id. (footnotes added)).  His ejection fraction was 43 percent; normal was greater than 45 percent.  (Id.)

---

[6]Hypokinesis is "[d]iminished or slow movement."  Stedman's Medical Dictionary, 836 (26th ed. 1995) (Stedman's).

[7]Akinesis is the "[a]bsence or loss of the power of voluntary movement . . . ."  Stedman's at 41.

It was then decided that Plaintiff wear a Holter monitor[8] for twenty-four hours.  (Id. at 229, 203-04.)  The results were read on October 4 and indicated an average heart rate of 73 beats per minute.  (Id. at 195, 200-02.)  Three isolated ventricular premature complexes and 88 isolated or paired supraventricular ectopic (out of place[9]) complexes were seen.  (Id.)  Eight diary entries noted symptoms ranging from lightheadedness to chest pain to left arm numbness.  (Id.)  "No correlating arrhythimas were noted."  (Id.)  An echocardiogram was abnormal with evidence of an anteroapical infarction; a left ventricular ejection fraction of 43 percent; mild left atrial enlargement; mild mitral insufficiency; and mild tricuspid insufficiency with mild elevation of the right ventricular systolic pressure at 39 mmHg (millimeters of Mercury).  (Id. at 196-99.)

On October 25, Dr. Lehman noted that Plaintiff was stable and was okay to return to light duty.  (Id. at 180, 340, 342.)  He was to return in two months.  (Id.)  Two months later, Plaintiff reported to Dr. Lehman that he easily became short of breath, could not work "much," and was applying for disability.  (Id. at 344.)

---

[8]"A Holter monitor is a [battery-operate] machine that continuously records the heart's rhythms," and is carried in a pocket or in a small pouch worn around the neck or waist.  Nat'l Inst. of Health, Holter monitor (24h), http://www.nlm.nih.gov/medlineplus/ency/article/003877.htm (last visited Sept. 19, 2012).  A person wearing a monitor is to keep a record of his or her symptoms to be matched by the doctor to the monitor findings.  Id.

[9]See Stedman's at 542.

Eight days later, on December 28, a test revealed a decreased left ventricular ejection fraction of approximately 33 percent, indicative of Class II congestive heart failure.[10] (Id. at 185, 275, 281.)

Plaintiff reported to Dr. Lehman in February 2007 that he easily became short of breath. (Id. at 338, 372.) Dr. Lehman noted that Plaintiff was smoking again. (Id.) He discussed with Plaintiff referring him to a specialist for a possible implantable cardioverter defibrillator (ICD). (Id.)

At Dr. Lehman's recommendation, Plaintiff was seen by Carey S. Fredman, M.D., a cardiologist, on March 8. (Id. at 313-14, 317-18.) Dr. Fredman noted that Plaintiff continued to smoke heavily, but had no other medical problems, e.g., hypertension, diabetes, or pulmonary diseases. (Id. at 317.) Since his August hospitalization, he tired easily; also, on exertion, he became short of breath and, occasionally, had chest pains. (Id.) He had a 20 percent two-year risk of life-threatening ventricular arrhythmia, indicating the need for a defibrillator pacemaker "to protect him from sudden cardiac death." (Id. at 318.) Dr. Fredman explained to Plaintiff that an electrophysiologic study would assist in (a) assessing his condition, (b) seeing what, if any, arrhythimas were inducible, and (c) determining the best selection and programming of the defibrillator. (Id. at 318.) Plaintiff wished to proceed. as recommended. (Id.)

_____

[10]The symptoms of Class II heart failure are "[s]light limitation of physical activity. Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea [shortness of breath]." Heart Failure society of America, Questions About HF, http://www.abouthf.org/questions_stages.htm (last visited Sept. 19, 2012).s

Consequently, Plaintiff was admitted to MBMC on April 16.  (Id. at 279-311, 315, 319-28.)   Following an electrophysiologic study, Plaintiff received a single chamber defibrillator pacemaker.  (Id. at 294-95, 303-04.)  A pre-discharge electrophysiologic study indicated that the pacemaker was functioning normally.  (Id. at 311, 328.)  Plaintiff was discharged on April 18  (Id. at 280.)  He was to follow-up with Dr. Fredman the next month.  (Id. at 316.)

Plaintiff did see Dr. Fredman in May; the defibrillator was found to be functioning normally.[11]  (Id. at 354.)  Plaintiff saw Dr. Lehman in June, reporting chronic fatigue and lightheadedness and occasional sharp, shooting chest pains.  (Id. at 371.)  His prescriptions were renewed.  (Id.)

In September, Plaintiff reported to Lynelle Jolliff, see note 11, supra, that he was experiencing occasional dizziness at any time and in any position.  (Id. at 353.)  In December, he informed Dr. Lehman that he was under a lot of stress, including financial, and had a "'butterfly feeling in [his] chest.'"  (Id. at 370.)  He also had palpitations and fatigue.  (Id.)  Two weeks later, Plaintiff informed Ms. Jolliff that he was doing well, although he continued to experience dizziness.  (Id. at 352.)

In February 2008, Plaintiff saw Paul Metcalf, D.O., for complaints of a cough, congestion, fevers, chills, wheezing, and shortness of breath for the past three days.  (Id. at 359.)  He denied any chest pain or palpitations.  (Id.)  On examination, he was not in acute

---

[11]Plaintiff saw Dr. Fredman or Lynelle Jolliff, a nurse practitioner, again in September and December 2007 and April, June, and October 2008.  (Id. at 349-53.)  His defibrillator was found to be functioning normally at each visit.  (Id.)

distress and was alert and oriented to time, place, and person. (Id.) He had a regular heart rate and rhythm and no murmur. (Id.) The impression was of bronchitis; upper respiratory infection; and tobacco abuse. (Id.) He was prescribed antibiotics and a cough syrup. (Id.) He stated that he would try to stop smoking. (Id.)

When seeing Ms. Jolliff in April, Plaintiff reported he was doing well and had no complaints. (Id. at 351.)

Plaintiff saw Dr. Lehman in July, reporting being very tired since having had a dream that he had had intense chest pain. (Id. at 369.) He was still smoking. (Id.) The same month, Plaintiff had a pharmacologic stress test with myocardial perfusion imaging. (Id. at 360, 373.) He had an ejection fraction of 46 percent; normal was greater than 50 percent. (Id.) The impression was of "[a]bnormal myocardial perfusion imaging with evidence of large anterior infarct." (Id.) Medical therapy and aggressive risk factor modifications were suggested. (Id.)

When seeing Plaintiff on August 6 about spots on his right foot, Deborah A. Depew, D.O., noted that he had not had bloodwork, including a lipid profile, done that year and scheduled such. (Id. at 358.) Plaintiff denied any chest pain or palpitations. (Id.) Plaintiff returned two weeks later with his girlfriend, reporting coccyx (the tailbone) pain that had been intermittent for the past year and worse in the last two weeks. (Id. at 356-57.) An x-ray was taken, following which Dr. Depew informed Plaintiff that he had probably fractured and displaced the coccyx. (Id. at 356.) Plaintiff then remembered having been butted into a metal gate the year before by a cow he was trying to load onto a trailer. (Id.) Dr. Depew

- 13 -

opined that the twenty pounds Plaintiff had gained since then had aggravated the fracture. (Id.)  He was to participate in physical therapy for four visits for pelvic stretches.  (Id.)  If there was no improvement then, injections would be considered. (Id.)

One week later, on August 27, Plaintiff reported to Dr. Lehman that he was doing well.  (Id. at 367.)  He had no chest pain.  (Id.)

In October, he told Ms. Jolliff he was doing well with the exception of "some lower back discomfort."  (Id. at 349.)

Plaintiff saw Dr. Lehman again in January 2009 for his five-month follow-up, reporting that he still could not do much because of fatigue.  (Id. at 366.)  He had no symptoms of congestive heart failure or of angina.  (Id.)  He continued to smoke.  (Id.)  His prescriptions were renewed. (Id.)

Also before the ALJ was an assessment of Plaintiff's physical residual functional capacity and questionnaires completed by Dr. Lehman.

In May 2007, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Dr. R. Stoecker.[12]  (Id. at 329-34.)  The primary diagnosis was ischemic heart disease; the secondary diagnosis was stats post automatic implanted cardiac defibrillator.  (Id. at 329.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for a total of at least two hours in an eight-hour workday; and sit for

---

[12]Dr. Stoecker listed his medical specialty code as "19" – internal medicine. See POMS Section DI 26510.090, https://secure.ssa.gov/poms.nsf/lnx/0426510090 (last visited Sept. 19, 2012).

approximately six hours in an eight-hour day.  (<u>Id.</u> at 330.)  His ability to push or pull was otherwise unlimited.  (<u>Id.</u>)  His only postural limitation was a need to never climb ladders, ropes, or scaffolds.  (<u>Id.</u> at 331-32.)  He had no manipulative, visual, or communicative limitations.  (<u>Id.</u> at 332-33.)  He had environmental limitations of needing to avoid concentrated exposure to extreme cold or heat.  (<u>Id.</u> at 333.)  Dr. Stoecker opined that an ability to function at the sedentary level was not inconsistent with a Class II heart failure. (<u>Id.</u> at 331.)

In December 2007, Dr. Lehman answered three questions about his assessment of Plaintiff for purposes of his DIB and SSI claims.  (<u>Id.</u> at 336, 365.)  The first question asked for his current diagnoses, "recommended treatment, and/or restrictions."  (<u>Id.</u>)  He responded with diagnoses of  ischemic cardiomyopathy, status post "ICD," and history of myocardial infarction.  (<u>Id.</u>)  The recommended treatment was simply described as "medical."  (<u>Id.</u>)  Asked if Plaintiff's endurance was affected by his impairments and, if so, how many hours he would need to rest in an eight-hour day, Dr. Lehman replied that his endurance was affected and he would need to rest for four hours.  (<u>Id.</u>)  Asked if Plaintiff could perform sedentary work full-time, Dr. Lehman responded that he could not.  (<u>Id.</u>)  He did not, as requested, state the reasons for his answer.  (<u>Id.</u>)

Asked in January 2009, if he still thought Plaintiff could not engage in full-time, sedentary work, Dr. Lehman confirmed that he did.  (<u>Id.</u> at 364.)  As before, he did not explain his answer, as requested.  (<u>Id.</u>)

## The ALJ's Decision

Evaluating Plaintiff's applications under the Commissioner's five-step procedure, the ALJ found at step one that Plaintiff met the insured status requirements of the Act through December 31, 2011, and had not engaged in substantial gainful activity since his August 2006 alleged disability onset date.  (Id. at 15-16.)

At step two, the ALJ found that Plaintiff had severe impairments of chronic ischemic heart disease and cardiac dysrythmia, and at step three that Plaintiff did not have an impairment of combination of impairments that met or medically equaled a listing impairment, including Listing 4.00 for the cardiovascular system.  (Id. at 16.)

The ALJ next addressed the question at step four of Plaintiff residual functional capacity (RFC).  (Id. at 16-19.)  He found that Plaintiff had the RFC to perform the full range of sedentary work[13] with restrictions of having a sit/stand option at the work site allowing him to work while seated and to frequently change positions; to only occasionally climb stairs and ramps, but never to stoop, kneel, or climb ropes, ladders, or scaffolds; and to avoid concentrated exposure to cold, heat, vibrations, and hazards of heights and machinery.  (Id. at 17.)  In explaining his RFC findings, the ALJ summarized the medical records.  He noted that a Class II congestive heart failure refers to the New York Heart Association Functional Classification (NYHA).[14]  (Id.)  Under that classification system, if Plaintiff "were able to ascend one flight of stairs without symptoms or walk one block with a mild to moderate

---

[13]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing."  20 C.F.R. § 404.1567(a).

[14]See note 10, supra.

incline, he would be classified as NYHA Class I, unless that same amount of activity resulted in excessive fatigue or dyspnea, in which case he would be NYHA Class II.  If walking from the kitchen to the living room caused symptoms, he would be NYHA Class III."  (Id.)  The ALJ noted Dr. Lehman's report that Plaintiff would need to rest four hours out of eight, but also noted that the record indicated that he spent his days "performing relatively sedentary activity without needing to rest."  (Id. at 18.)  Although Plaintiff reported that he could not do much due to fatigue, the record did not reflect any exertional symptoms or angina; and, Plaintiff continued to smoke.  (Id.)  He had been described as doing well; his pacemaker was functioning  normally.   (Id.)   Plaintiff had not reported any fatigue, lightheadedness, or shortness of breath after September 2007.  (Id.)  When testifying about his day, Plaintiff had not cited the need to rest or nap.  (Id.)  The ALJ found that Plaintiff's description of chronic severe fatigue, shortness of breath, and pain were to be given much weight because they were inconsistent with the preponderance of the evidence.  (Id. at 19.)  That evidence established that Plaintiff was not able to maintain the level of activity he formerly did; however, it did not establish that he could not "sustain relatively sedentary work activity over the course of a regular workday."  (Id.)  The ALJ also noted that Plaintiff had not done the one thing he needed to do as part of his treatment – stop smoking.  (Id.)  "[His] refusal to stop smoking suggests that he does not consider his impairments so 'severe and disabling' as to require him to stop smoking."  (Id.)

At step four, the ALJ found that Plaintiff could not perform his past relevant work. (Id. at 20.)  At step five, the ALJ found that, with his age, education, work experience, and

RFC, Plaintiff could perform the jobs described by the VE.  (<u>Id.</u> at 20-21.)  He was not, therefore, disabled within the meaning of the Act.  (<u>Id.</u> at 21.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  <u>Id.</u>  Accord **Martise v. Astrue**,

- 18 -

641 F.3d 909, 923 (8th Cir. 2011); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006).

Conversely, "[a]n impairment is not severe if it amounts only to a slight abnormality that

would not significantly limit the claimant's physical or mental ability to work," i.e., "[it]

would have no more than a minimal effect on the claimant's ability to work . . . ." **Kirby v.**

**Astrue**, 500 F.3d 705, 707 (8th Cir. 2007).  "Severity is not an onerous requirement for the

claimant to meet, but it is also not a toothless standard . . . ." **Id.** at 708 (internal citations

omitted).

At the third step in the sequential evaluation process, the ALJ must determine whether

the claimant has a severe impairment which meets or equals one of the impairments listed in

the regulations and whether such impairment meets the twelve-month durational requirement.

See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the

claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.

**Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a

claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R.

§ 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's

office; it is the ability to perform the requisite physical acts day in and day out, in the

sometimes competitive and stressful conditions in which real people work in the real world."

**Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted).

Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical

records, observations by treating physicians and others, and an individual's own description

- 19 -

of his limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord

**Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).   "'The need for medical evidence,

however, does not require the [Commissioner] to produce additional evidence not already

within the record.   [A]n ALJ is permitted to issue a decision without obtaining additional

medical evidence so long as other evidence in the record provides a sufficient basis for the

ALJ's decision.'"   **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting

Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

     In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.

**Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall v. Massanari**, 274 F.3d

1211, 1217 (8th Cir. 2002)).   This evaluation requires that the ALJ consider "'(1) the

claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the

precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of

medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the

absence of objective medical evidence to support the claimant's complaints.'"   **Buckner v.**

**Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524, which cited

Polaski v. Heckler, 739 F.2d 1320,  1322 (8th Cir. 1984)).   "'The credibility of a claimant's

subjective testimony is primarily for the ALJ to decide, not the courts.'"   **Wagner**, 499 F.3d

at 851 (quoting Pearsall, 274 F.3d at 1218).   After considering the Polaski factors, the ALJ

must make express credibility determinations and set forth the inconsistencies in the record

which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452

(8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as

- 21 -

adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u> <u>v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  "If, [however,] after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789).  <u>See</u> <u>also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred by failing to (1) give the proper weight to the opinion of Dr. Lehman and (b) find him credible.

<u>Dr. Lehman's Opinion.</u>  Dr. Lehman opined in December 2007 that Plaintiff would need to rest for four hours during an eight-hour day and that he could not perform sedentary work.  Thirteen months later, he repeated his opinion that Plaintiff could not engage in full-time sedentary work.  The ALJ noted, and disagreed, with this assessment.  Plaintiff challenges that decision.

- 22 -

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted); accord **Martise**, 641 F.3d at 925. Thus, "'an ALJ may credit other medical evaluations over that of the treating physician when such assessments are supported by better or more thorough medical evidence.'" **Id.** (quoting Brown v. Astrue, 611 F.3d 909, 951 (8th Cir. 2011)). And, "'[w]hen deciding how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations.'" **Id.** (quoting Brown, 611 F.3d at 951). See also 20 C.F.R. §§ 404.1527(d) and 416.927(d) (listing six factors to be evaluated when weighing opinions of treating physicians, including supportability and consistency).

In December 2007, Plaintiff had informed Dr. Lehman that he was under stress, including financial stress. That same month, he told Ms. Jolliff that he was doing well, although continuing to experience some dizziness. Two months later, he informed Dr. Metcalf that he was not having any chest pain or palpitations. Four months later, he again informed Ms. Jolliff that he was doing well; he had no complaints.

- 23 -

"It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," **Davidson**, 578 F.3d at 843, or when it consists of conclusory statements, **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010).  See also **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements."). Dr. Lehman's opinions are not supported by his findings and are conclusory.  Indeed, Dr. Lehman failed to respond to the request in both questionnaires that he explain his opinions about whether Plaintiff could perform sedentary work.

The only support for Dr. Lehman's opinion about Plaintiff's ability to work is Plaintiff's own reports of his symptoms.  Those reports begin the visit after Dr. Lehman released him to return to light duty.  And, as noted by the Commissioner, Dr. Lehman's terse opinion, unexplained as requested, in January 2009 follows Plaintiff's report to him that he could not do much because of fatigue.  "The ALJ was entitled to give less weight to [Dr. Lehman's] opinion, because it was based largely on [Plaintiff's] subjective complaints rather than on objective evidence." **Kirby**, 500 F.3d at 709; accord **Renstrom v. Astrue**, 680 F.3d 1057, 1064 (8th Cir. 2012).

Credibility.  Plaintiff also argues that the ALJ erred by not finding his subjective complaints credible.

- 24 -

"'If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Renstrom**, 680 F.3d at 1065 (quoting <u>Juszczyk v. Astrue</u>, 542 F.3d 626, 632 (8th Cir. 2008)).  One reason given by the ALJ was the lack of supporting objective evidence.  Although "'[a]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them," **id.** at 1066 (quoting <u>Wiese</u>, 552 F.3d at 733), the absence of objective medical evidence to support a claimant's complaints is a proper consideration when assessing that claimant's credibility, see **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008).

Another reason given for discounting Plaintiff's credibility was his failure to stop smoking as instructed by Dr. Lehman and the heart surgeons.  This is a proper consideration. <u>See</u> **Id.** (finding that ALJ properly construed claimant's failure to stop smoking as a failure to follow a prescribed course of treatment, a failure that was properly considered by the ALJ when making his credibility determination); **Wagner**, 499 F.3d at 851 ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility.") (internal quotations omitted).

Plaintiff argues that the ALJ erred when assessing his daily activities and finding them to be inconsistent with his claims of disabling fatigue that preclude even sedentary work.  For instance, Plaintiff cites his reports of being tired with minimal activities and spending most of his day sitting and watching television.  He also states that there is no evidence he helps in his girlfriend's father's shop or to move cattle.  Plaintiff is correct, in part – there is no

evidence he helps in the shop.  There is, however, evidence he helps move cattle; the evidence is his description to Dr. Depew of how he fractured his tailbone.  There is also evidence that he hunts and fishes when the weather permits, an environmental limitation included by the ALJ in his RFC findings.  He walks on a treadmill three times a week for twenty minutes.  Plaintiff cites limitations he described to the agency employee in May 2007 of having to rest after working in his garden for ten minutes and of constantly feeling tired.  The ALJ was not obligated to accept without question Plaintiff's self-reported limitations on his daily activities allegedly caused by his medical impairments.  See **Jones**, 619 F.3d at 975 (affirming adverse credibility determination of ALJ who found claimant's activities to be limited on a "self-imposed voluntary basis" rather than due to her medical condition); **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (finding ALJ's adverse credibility determination was supported by record, including the inconsistencies between claimant's "self-reported limitations on his daily activities" and the medical record).

In the same report of contact cited by Plaintiff in support of his credibility argument, he informed the agency employee that he did not know what job he could do because he was "only capable of sitting and doesn't have the interest or skills for a sit down job." (R. at 159.) The VE, however, knew what jobs he could do with a capacity for only sedentary work and a need for a sit/stand option and frequent change of position.

## **Conclusion**

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman**, 596 F.3d at 964.  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  20th  day of September, 2012.